## No. 14,057.

INDUSTRIAL COMMISSION ET AL. *v.* WETZ ET AL.

(66 P. [2d] 812)

Decided March 15, 1937.

Mr. Byron G. Rogers, Attorney General, Mr. Louis Schiff, Assistant, Mr. Teller Ammons, Mr. Richard F. Ryan, Mr. Harold Clark Thompson, for plaintiffs in error.

Mr. Elmer P. Cogburn, Mr. Christian D. Stoner, for defendants in error.

*En Banc.*

Mr. Justice Young delivered the opinion of the court.

The defendants in error, mentioned herein as claimants, filed a claim before the Industrial Commission under the Workmen's Compensation Act for death benefits to which they say they are entitled as dependents of one Eugene W. Wetz, whom they allege came to his death as the result of an accident, arising out of and in the course of his employment by the City and County of Denver, his employer. The employer carried insurance with the state insurance fund, designated in this opinion as insurer. Reference also will be made to these parties as defendants. The claimants, being unsuccessful before the commission, instituted an action in the district court to review the findings and award, which court set aside the order of the commission denying death benefits and remanded the case with directions to enter an award in favor of claimants. Defendants prosecute a writ of error to review that judgment.

Due to the peculiarity of the commission's findings and to the fact that the issues may only be determined from the testimony, we deem it advisable to set forth such testimony in some detail in order that the issues be clearly presented and the correctness or incorrectness of the judgment of the trial court determined.

The following facts clearly appear from the record and are undisputed: On the 15th of February, 1936, decedent was working for the City and County of Denver in the

highway department. He reported for work at about 7:30 in the morning. About 9:15 the foreman sent him across the street to start a Fordson tractor of the street cleaning department. It was a cold morning, the temperature being approximately zero or slightly under. On that morning from fifty to fifty-five trucks had been started in the building where the tractor was standing; the building was large and had been kept closed except when the doors were opened to permit the egress of trucks. The gas discharged by the motors was heavy and hung close to the floor. Such discharge from the motors produces some carbon monoxide which is poisonous and a large amount of carbon dioxide, which is not poisonous, but by occupying space in the lungs prevents the entrance of a normal amount of oxygen. The examination of one of the witnesses, who was working in the building, was in part as follows: "Q. What effect did that have on you that particular morning, if any? A. Well, I absorbed a lot of gas and there was a lot of it that morning and it kind of knocked me out, I don't need a lot of it." Another witness testified that it "knocked him out" when he went into the garage. The foreman who ordered decedent to start the tractor was asked: "What is the first thing you do, that is, if you were sent over to start a Fordson tractor or truck?" He responded as follows: "Well, the first procedure, of course, as we go over there, we take a hot shot battery to help along in case we can't start it, but we go over it and open up the circuit there, keep the spark retarded, pull the choke and get around and open the throttle a little bit and get around in front and crank it. If we are unable to start it then we take the hot shot battery. We disconnect the low tension and hook on the hot shot battery onto the coil, then we go through the same procedure, of course, of cranking." After outlining the foregoing as the customary procedure for starting a tractor the foreman was asked if it required considerable effort to crank one of these tractors and answered in the affirmative. Another witness was asked:

"Is it customary for them to attempt to crank the tractor before they connect these hot shot batteries? That is, for a mechanic to turn it over once or twice to see if it will run before they connect their hot shot?" He answered: "I would say it would be customary, because it takes some time to connect a hot shot, and if a man is in a hurry he is going to start it the quickest way possible."

After decedent arrived at the tractor one of the men passing by saw him standing with his left hand on the radiator cap in the position in which a man stands to crank the motor. He did not see decedent actually crank it. This was about ten minutes before he was told that Wetz "was knocked out."

Shortly after decedent had been directed to start the tractor the man who was to take it out found him sitting on the floor by the side of the machine with a hot shot battery between his legs and with his head lying over on his shoulder; being unable to arouse him he called for assistance and Wetz was carried into an office nearby. A doctor was summoned immediately, who, upon arrival, pronounced the man dead.

Carbon monoxide poisoning as a sufficient independent cause of death, and electric shock from the battery and coils as a contributing cause, are conceded by claimants, in view of the medical testimony, to be eliminated from the case. They now place their reliance on overexertion, under the conditions shown to exist, as the proximate cause of dilatation of the heart and consequent death.

The doctor who performed the autopsy was the only one of the several called as witnesses who saw the conditions thereby disclosed. All the others testified hypothetically. He testified that the examination showed a dilatation of the right auricle of the heart which was caused by something of a sudden nature and of recent origin as evidenced by no degenerative changes in the liver which are always found where such a condition is of long standing; that he found a foramen ovale or opening

from the left to the right auricle; that it was covered by a flap on the inside of the left auricle; that such a condition results from a failure of complete closing of a pre-natal opening between the two cavities and is found in 25 per cent of all autopsy cases; that the opening was small; that it was surrounded by scar tissue; that there was no evidence of a recent breaking loose of the flap covering the opening; that the flap was on the left auricle side of the opening where the pressure is greater than in the right auricle, thus tending to keep the flap closed; that from his examination the heart muscle grossly appeared to be in good condition; that in his opinion the foramen ovale as he found it was negligible in determining the cause of death; that he did not believe it had anything to do with the death; that it was so well closed that not more than a drop or two of blood ever got through. This doctor further testified that overexertion could cause the dilatation; that the probability was in favor of the death being caused by overexertion; that the atmospheric condition could have something to do with it and could alone cause it; that carbon dioxide (carbon monoxide being ruled out as the cause of death by a blood test) present in the air would make it harder to get oxygen and would have a tendency to weaken the heart to some extent; that the breathing of air filled with carbon dioxide and a small amount of carbon monoxide are factors that can be contributory to dilatation of the heart; that sometimes a foramen ovale causes dilatation but not one such as this; that dilatation does not occur without overexertion; that there was no condition intrinsic in the heart that would cause death. The foregoing was the testimony of the autopsy surgeon based upon his actual examination and upon deceased's condition as disclosed by the autopsy.

The lay testimony, including that of the widow of deceased, was to the effect that Wetz' health had been good and that he never had complained of any trouble.

Dr. Buck made only an outward examination of the body. His entire testimony with respect to the cause of death was to the effect that 99 per cent of sudden deaths are due to heart trouble and that as to this particular case he could not tell the cause of death from an inspection of the body but would want an autopsy.

Dr. Blanchard's testimony showed merely the delivery by him of a sample of deceased's blood to Dr. Freshman for examination, and the latter's testimony was to the effect that death was not caused by carbon monoxide poisoning.

Dr. Yegge testified that a heart dilatation might develop from a foramen ovale, because under some conditions blood might go through the opening even with a flap over it, if the flap were not adherent, and that he did not believe this one was. Asked as to whether the man died from overexertion he answered: "From the testimony this morning I do not believe that I could say whether it was natural causes or overexertion."

Dr. Burnett testified in effect that patent (unclosed) ovale is a fairly common abnormality and that an enlargement of the right auricle associated with it means a strain on the right side of the heart; that he did not know whether the condition disclosed here in and of itself would cause death, but in view of deceased's previous healthy condition and color, it could have done so but probably did not; that an undue strain for that individual would be required to cause death; that a heart in the condition this was found to be would not stand as much as a normal heart and might break down under overexertion; that there was a strain on the right side of the heart or there would have been no dilatation; that it was not his experience that death often occurs as the result of acute dilatation without any evidence of trauma or external violence in people who apparently were previously well; that he had known of patients dying in bed from acute dilatation but they were not apparently well previously; that persons may be suffering from

heart disease and not be aware of it themselves and their condition not apparent to laymen; that in his opinion persons who die of acute dilatation with no history of prior attacks or ailments would disclose on examination something other than simple dilatation such as occurred in this case; that an enlargement of the right auricle is to be expected from the presence of a patent foramen ovale if there is sufficient patency and an overload; that it might develop gradually over a period of years; that if it developed gradually the patient usually would be aware of it, but might not be, and that he probably would not be in perfect health throughout the period; that individuals with patent foramen ovale sometimes die suddenly.

The testimony of Dr. Dyde was to the following effect: That the autopsy report did not disclose an adequate cause of death; that is, that the dilatation of the right auricle and the patent foramen ovale did not seem to be a sufficient and adequate cause of death; that dilatation may come suddenly in certain diseases or may develop over a long period of time from strain; that a dilated auricle with no organic disease of any kind would be a congenital defect which would not be brought on by overwork; that he could not say what did cause this death; and when asked if it could be caused from overexertion his answer was, "like anybody else," but that he could not surmise.

It will be observed that the foregoing medical testimony tends in no way to negative the fact that if exertion were present under the atmospheric conditions obtaining it would be a contributing cause to the dilatation disclosed by the autopsy report.

We think the foregoing presents a situation in which there are circumstances disclosed by the evidence sufficient to prove that the deceased shortly before his death had engaged in cranking the tractor, and there is direct testimony that the motor was cold and that cranking it

in such condition requires considerable exertion. The dilatation, under the medical testimony, is adequately explained as resulting from exertion in the existing atmospheric condition concerning which there is no dispute. There was testimony that the dilatation might result from a patent (unclosed) foramen ovale, but there is no testimony that it would result from one that is closed and the positive testimony of the only doctor who saw the condition is that it was closed by a flap on the side of the greater pressure which would tend to keep it closed. All the circumstances were consistent with the fact of deceased having exerted himself to the extent required to crank the tractor. The dilatation, which is not controverted, under competent medical testimony is adequately explained by overexertion under the atmospheric condition shown to be present and, in the opinion of the autopsy surgeon, by the atmospheric condition alone. That these conditions, if existent, do adequately account for it was not contradicted by any medical testimony.

The claimants were not required to demonstrate the cause of the dilatation, but merely to show its cause by competent evidence. Circumstantial evidence is competent. Even in a criminal case, circumstantial evidence is sufficient to convict, if the jury is convinced by it of defendant's guilt and find the circumstances consistent with guilt and inconsistent with any reasonable hypothesis of innocence. Having introduced competent evidence to prove exertion shortly before death and having shown as a circumstance a dilatation—adequately explained by exertion—the commission, in the discharge of its function under the law, should have considered the evidence and should have made a finding as to the fact that the evidence was competent to prove; namely, as to whether there was exertion. Instead, the commission found "neither is there any evidence that decedent at any time exerted himself strenuously or at all." This

is a conclusion of law. As pointed out in *United States F. & G. Co. v. Industrial Commission,* 96 Colo. 571, 45 P. (2d) 895, "What constitutes evidence is a question of law." An erroneous finding that there is no evidence of exertion, when the record discloses such evidence, is not equivalent to a finding that there was no exertion. The existence or nonexistence of exertion are the relevant facts. The duty of finding one or the other of such facts, when an issue under the evidence, is mandatory on the commission.

In the light of the uncontroverted circumstances that deceased had always appeared to laymen to be in good health and that he had never complained of ill health; that he was doing work that customarily involved considerable exertion; that he was breathing an atmosphere charged with a small amount of poisonous carbon monoxide and a large amount of carbon dioxide sufficient to affect noticeably two other workmen; that in the light of the uncontroverted testimony of the autopsy surgeon either exertion or the atmospheric condition alone could cause dilatation; in the light also of the uncontroverted fact that dilatation did occur; and in the absence of any testimony of other medical experts as to any other probable causes of dilatation where there is a foramen ovale closed by a flap as deceased's was, we think the trial court was right in holding that as a matter of law there was uncontroverted evidence of a sufficient cause of the dilatation; namely, either overexertion or a gas laden atmospheric condition, or both. A determination that the evidence is competent and that it is uncontroverted is the determination of questions of law. That it necessarily follows from a determination of propositions of law that on uncontroverted evidence as it stands the commission must find the death was caused by accident, is not an invasion of its fact finding function. This was pointed out by our court in *Skaggs Co. v. Nixon,* 97 Colo. 314, 50 P. (2d) 55. In that case we used the following language that in principle is applicable to the present case:

"We hold, therefore, that the district court was correct in determining that there was competent evidence supporting the claim that Nixon was an employee of the Skaggs Company and that such evidence was uncontroverted. When the court determined these two matters of law, it necessarily followed that the commission, having found that there was no employment when the uncontroverted evidence showed employment, acted in excess of its powers; consequently such finding of fact could not stand. It is contended that the court substituted its finding of fact, that Nixon was an employee of the Skaggs Company, for the finding of the commission, but when the court's ruling is analyzed, the contention appears to be without merit. The commission found the existence of a negative condition—nonemployment. When the court found that there was competent evidence of employment and that it was uncontroverted, it was passing upon questions of law, and not making a finding of fact. The fact of employment followed from the findings of law, but in making findings of law from which conclusions of fact must of necessity follow, the trial court does not thereby usurp the fact finding function of the commission." The opinion in the case of *Carroll v. Industrial Commission,* 69 Colo. 473, 195 Pac. 1097, while it does not fully set forth the reasoning employed in arriving at the conclusion there reached, does not, we believe, lay down any other or different proposition from that stated in the Nixon case.

█ The direction of the trial court in this case was correct. Having found as a matter of law that there was uncontroverted evidence showing exertion and that exertion, under the circumstances, was an adequate cause of heart dilatation which produced death, and the findings of the commission on uncontroverted evidence clearly showing that such cause arose out of and in the course of the employment, under section 4481, C. L. 1921, it was proper for the district court to order the commission to enter the proper award. Since under the trial court's

determination of questions of law it is inescapable that findings of accidental death must be made from uncontroverted evidence the court was acting within its powers and within the letter and spirit of the above section in ordering an award. The making of the findings of fact that necessarily follow from conclusions of law is but incidental to the making of the award under the situation here disclosed.

The judgment of the trial court is affirmed.

MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND dissent.

MR. JUSTICE BOUCK, dissenting.

1. Under the Workmen's Compensation Act of Colorado ('35 C. S. A., Volume 3, pages 1309-1391, §§280-429) the Industrial Commission is the sole fact-finding body in compensation cases. If the commission fails in any instance or in any respect to act on an issue of fact the case must be sent back for its further consideration either upon the facts then before it or with the aid of a further hearing. Section 381, page 1371 ibid. [C. L. 1921, Sec. 4476], is clear: "If upon trial of such action [that is, one brought in the district court under section 378, page 1370, by any person in interest who is dissatisfied with a finding, order or award of the Industrial Commission] it shall appear that * * * the commission * * * has for any reason, not in fact heard and determined the issues raised, the court shall, before proceeding to render judgment, unless the parties to such action stipulate to the contrary, transmit to the commission a full statement of such issue or issues not adequately considered, and shall stay further proceedings in such action until such issues are heard by the commission and returned to said court."

Our court's solicitude to enforce the above provision and to avoid judicial interference with the commission's exclusive fact-finding function is rather strikingly revealed in the case of *Black Diamond Fuel Co. v. Frank*, 99

Colo. 528, 64 P. (2d) 797, where the writer, in a dissenting opinion, and the author of the present majority opinion, in a partially dissenting opinion, shared and expressed the belief that the majority there were actually making even the universally recognized principle of "the law of the case" improperly yield to such solicitude.

The binding nature of the commission's fact-findings has been declared by this court times without number. See: *Industrial Com. v. Dorchak*, 97 Colo. 142, 47 P. (2d) 396; *United States Co. v. Industrial Com.*, 96 Colo. 571, 45 P. (2d) 895; *Tavenor v. Indemnity Co.*, 84 Colo. 521, 272 Pac. 3; *Ellermann v. Industrial Com.*, 73 Colo. 20, 213 Pac. 120; *Industrial Commission v. Fanganiello*, 72 Colo. 140, 209 Pac. 803; *Weaver v. Industrial Com.*, 69 Colo. 507, 194 Pac. 941; and the numerous authorities cited in those cases.

In the Ellermann case, supra, which in some respects bears a striking resemblance to the case at bar, Mr. Justice Burke declared: "If death was due to 'over-exertion' 'arising out of' the employment and would not have occurred save for such employment, then the 'over-exertion' was an 'accident.' * * * Much as we regret the necessity, it therefore becomes absolutely essential that this cause be remanded to the district court with directions to return it to the commission for additional findings of fact, and that the commission amend its findings by determining whether this death was due to over-exertion."

2. The majority opinion herein does not remand the case for further fact findings by the commission. Instead, it supersedes the commission altogether, even as the trial court did, by a finding of its own that there was overexertion, and an unqualified command to the commission to make an award of compensation. The ground assigned for so doing is this: "An erroneous finding that there is no evidence of exertion, when the record discloses such evidence, is not equivalent to a finding that

there was no exertion.'' In support of this reasoning a quotation is given from *United States Co. v. Industrial Com., supra,* as follows: ''What constitutes evidence is a question of law.'' Assuming all this to be true, it necessarily follows that the proper remedy is to send the case back to the commission as fact-finding body to make a finding one way or the other on what this court says is evidence of exertion. This brings me to the concrete matter of inquiring what the evidence in question was.

3. Time will not permit me to supplement the statement of fact given in the majority opinion or to analyze the evidence as a whole. No direct evidence of unusual or any exertion is in the record. The only evidence that could possibly be considered even circumstantial evidence is given by the witness Gindling.* There is not even circumstantial evidence to prove that if there was overexertion it was the cause of death. According to some of the medical witnesses the death may have been due to purely natural causes, including a patent foramen ovale, which is clearly shown to have been a congenital condition in Wetz's heart. The autopsy physician, indeed, contradicts himself in a material matter: he testified he made no microscopic examination of the heart muscle, but his unverified autopsy report says that he did. The weight of his expert opinion, based upon the same autopsy report on which the other and opposite expert opinions were based, is solely for the fact-finding body to determine, not for the court. Gindling's testimony cannot lawfully constitute conclusive evidence that there was overexertion and that it must necessarily have caused the dilatation of the deceased's heart. To accomplish that we must—contrary to fact—say the only

*NOTE. Gindling testified: "He was standing right in front of the Fordson. He had one hand on the Fordson. I don't know whether he was cranking it or whether he was going to crank it or just got through, or what. I was in a hurry." Then: "Q. Would you say in observing Mr. Wetz that he was in the position they stand in when they crank a truck? A. Yes." Later: "I know he was leaning on the radiator like that (illustrating)." Can this court say what corroboration or impeachment lay in that dramatization as testimony before the referee?

inference to be drawn is that the employee did crank the tractor and did overexert himself in so doing. Which of two or more inferences shall be drawn is a question for the fact-finder. But even suppose the witness had testified that he actually saw the cranking and the alleged overexertion. If a court must accept at face value the evidence of a surviving witness as to what occurred when he and a person since deceased were the only ones present, then we may discard all the rules of evidence and say that the fact-finding body cannot exercise the customary power of judging as to the credibility of a witness and cannot, if it sees fit, reject what such body considers untruthful evidence. Then the most brutal murderer, claiming the privilege of not taking the witness stand, would entitle himself to a directed verdict of not guilty by successfully planning to kill if and when a perjuring crony has been smuggled in as the only other living eye-witness. The latter's story could thus be made binding upon jurors who as fact-finders might wholly disbelieve him. Surely such is not the law.

It sufficiently appears from the foregoing that I am constrained to dissent because of the failure of the court to remand the case to the district court with directions to the commission to make proper findings and report them back to that court.

MR. JUSTICE HOLLAND concurs in this opinion.

MR. JUSTICE HOLLAND, dissenting.

Mindful of the statute under the provisions of which a review of an award of the Industrial Commission in workmen's compensation cases may be had, and which provides that we may summarily review questions of law involved, I will not subscribe to an opinion by which it is evident that this court has constituted itself a fact-finding body, particularly when it necessarily must, and did, *assume* a state of facts in order to arrive at the conclusions that follow. This court long has recognized the

force and effect of the controlling statutes, and in cases too numerous to mention, has refused to disturb an award of the commission based upon its findings of fact, and since it is my firm conviction that the majority opinion herein has no other effect than a violation of this rule, I respectfully dissent.

As to whether or not there is a finding of fact by the commission which would support its award, in the present case can only be determined from such finding and award. These do not appear in the majority opinion, and their essential parts are as follows:

"Claimant contends that her husband's death was the result of overexertion, electric shock and carbon monoxide poisoning. The evidence is uncontradicted that decedent's death was the result of a right dilation of the heart, and that carbon monoxide poisoning was not a factor. There was no evidence that decedent had received any electric shock even though under certain circumstances, which were not shown to exist, he might have. Neither is there any evidence that decedent at any time exerted himself strenuously or at all.

"The commission finds that from the evidence that decedent's death was the direct result of heart failure, the cause of which could not be ascertained by examining surgeons. Claimant having failed to sustain the burden of proof that her husband's death was either caused or hastened by an accidental injury arising out of and within the course of his employment. It is ordered the claimant's claim  *  *  *  be and the same is hereby denied."

I am wholly unable to follow the reasoning and conclusions of the majority to the effect that there was competent evidence to prove exertion, even circumstantial. By way of illustration, they say that "Even in a criminal case, circumstantial evidence is sufficient to convict, if the jury is convinced by it." The difficulty in the case before us is that the circumstances revealed by the evidence did not convince the commission, whose province

is to determine facts, and whose factual findings we cannot disturb. Neither do I understand that the commission did not discharge its function, in that it did not consider the evidence or did not make a finding as to the fact the evidence was competent to prove, that is, as to whether there was exertion as stated in the majority opinion. I believe that is exactly what the commission did, and it so declared and when it said ''Neither is there any evidence that decedent at any time exerted himself strenuously or at all,'' and when it made this declaration it was considering that very question, namely, exertion. The opinion says, ''This is a conclusion of law.'' It is no more a conclusion of law than what the opinion says was the duty of the commission, that is, that it ''should have made a finding as to the fact that the evidence was competent to prove; namely, as to whether there was exertion.''

There properly could be no other finding by the commission than that made, if there was no substantial evidence of exertion, and I challenge anyone to discover any such evidence from a search of this record. We have consistently held in cases of this character that there must be sufficient and substantial evidence to establish that the accident arose out of and in the course of the employment, and that it had a direct causal connection therewith. If any inference may be drawn from the evidence, it can only be by the commission, and not by the court. Here the commission made its finding that there was no evidence that decedent exerted himself at all, and if there is to be a splitting of hairs as there has been by the majority in its opinion, there is no reason why the employer or insurer should not sit in at the operation. The only circumstance from which a weak inference of exertion by deceased could be drawn was that he was seen standing in a position as if about to crank the tractor motor. Possibly he did crank it but the establishment of a causal connection between his death and his employment cannot rest upon such possibility, con-

jecture or circumstance. Moreover, the ultimate question, assuming that an inference of "overexertion" is permitted to be drawn by the court, rather than by the commission, is whether or not "overexertion," if present, contributed to the heart failure. On this disputed question, the commission made a direct finding that the claimant had failed to sustain the burden of proof that her husband's death was either caused or hastened by an accidental injury—"overexertion"—arising out of and within the course of his employment.

Had the commission drawn such an inference from the evidence, as this court now has so inconsistently done, its conclusion on such inference should not be disturbed; but if it weighs the evidence and draws no inference, then it has acted within its province. Summed up, to overthrow the finding of the commission, the majority, to justify its opinion, had to assume from circumstantial evidence, overexertion. The commission said it did not exist. The majority then takes a further ill-considered step and overthrows the finding of fact by the commission against the claimant, based upon sharply conflicting medical testimony, that the heart condition "foramen ovale" could have caused the heart dilation on the one hand, and that overexertion could have caused it on the other. If the rule laid down in the majority opinion is to be followed in this jurisdiction, then every disability occurring in the course of employment, irrespective of accidental origin may be included in the list authorizing recovery. I believe the judgment of the lower court should be reversed.

Mr. Justice Bouck concurs in this opinion.