No. 16,719.

INDUSTRIAL COMMISSION OF COLORADO ET AL. *v.* DANIELS.
(236 P. [2d] 291)

Decided October 1, 1951.

Messrs. McComb & Zarlengo, Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Peter L. Dye, Assistant, for plaintiffs in error.

Messrs. Paynter & Paynter, for defendant in error.

*En Banc.*

Mr. Justice Knauss delivered the opinion of the court.

This proceeding involves a death claim under the Workmen's Compensation Act. The Industrial Commission held adversely to claimant, but in an appropriate action, the district court ordered the commission to

award death benefits as provided by law. This order is now before us for review.

Jim Daniels was an overseer, or foreman, for Weisbart & Company, and had been acting as such for some eight or nine years. His duties were to look after cattle and feed them. While so employed on February 6, 1950, he became ill; went to his home; and later was removed to a hospital where he remained for eight days. He was rehospitalized on May 24, 1950 and died July 6, 1950. Death was attributed to "cordio [cardio] vascular disease," by his physician. No autopsy was performed.

Daniels filed a claim for compensation, claiming "heart attack." His claim was set for hearing on July 5, 1950, and partially heard when he died. His wife, defendant in error, then filed the instant claim for compensation on account of his death, claiming "enlargement of and damage to heart" as the nature of the injury, and "cardio vascular condition, caused by said accident," as the cause of death.

The referee's findings and order, which in due course were "approved, affirmed and adopted" by the commission, read as follows:

"Respondent employer operates a livestock feeding lot. Jim Daniels for the past eight or nine years was employed by the respondent as an overseer and livestock feeder. His duties included the loading of feed on a truck, driving the truck to the particular pens assigned to him and unloading the feed for the cattle therein. This work is more difficult during certain periods than others for the reason that new cattle, those of recent arrival, are fed a different diet for the first two or three weeks than they receive thereafter, and the special diet requires hand-loading, whereas the regular diet is loaded direct from the grinder.

"On February 6, 1950 Daniels was seen from a distance by Jack Boxer, one of his employers, to keel over on the material which he was unloading. Upon coming up to him, Boxer thought Daniels did not look well and sug-

gested that he go home, which Daniels did some thirty minutes later. Daniels called on a local doctor who hospitalized him immediately. Eight days later he was released but was rehospitalized in May. He died on July 6, 1950 as the result of a cardiovascular condition, which the surviving widow alleges to be the result of his employment.

"The Referee is of the opinion and so finds that no incident in claimant's employment can be considered as an accidental injury within the meaning of the Workmen's Compensation Act. That if decedent's death can in any way be associated with his employment it would be that hard work over an indefinite period of time had hastened his collapse. Such a situation is not compensable under the Colorado Occupational Disease Disability Act.

"It is, therefore, ordered: That claimant's claim for death benefits by reason of the death of her husband on July 6, 1950 be and the same is hereby denied and dismissed."

Boxer, one of Daniels' employers, testified in part as follows: "Q. Was the work any different on February 6th, the day of this occurrence, than any other day? A. No, sir, that was just a daily routine and there was nothing taken off or added on that day. Q. You don't know of anything unusual that happened to him, then, at or about the time you saw him keel over? A. No, sir, I don't. * * * Q. On February 6th he was doing the same type of work he had been doing for at least [last] four years? A. Yes, sir. Q. And you observed nothing unusual about his work— A. No, I did not. * * * Q. Well, now, all of his actions were normal? You didn't notice anything wrong with him until he keeled over? A. That's right. It just happened I seen him. I was just going about my business watching my cattle. Q. And before that he looked all right to you? A. Before he looked like he did every day. * * * "

Dr. Eakins, decedent's physician, stated that decedent

had an enlarged heart, and testified in part as follows: "Q. What would you say would be the cause of that condition, Doctor? A. Well, there are various things, but the usual condition of an enlarged heart is a severe strain, heavy lifting or severe exercise of some kind, like an athlete; an athlete as a rule has a large heart, due to their practice, their continued exercise."

When questioned regarding his report to the Industrial Commission of Colorado, the physician answered as follows: Q. On Exhibit No. 3, in answer to question No. 7, 'Is Present Disability due Entirely to his Injury?' you answered, 'No Injury.' Was that your opinion at that time? A. That was my opinion at that time. Q. In answer to question No. 10 'Remarks, exceptional medical facts, or any other information which you deem necessary in considering this case:' You have answered, 'This is not an accident case but medical.' Was that your opinion at that time? A. That's right. * * * Q. You felt it was just a heart condition that came on due to advanced age? A. *I did not know what it came on from.* I didn't state what the cause was. I just stated it was a heart condition, but as to the cause I didn't say. Q. But felt it was nothing associated with his work? A. Well, I wouldn't say that. Q. Under the questions on the report you mention nothing about his work, stated it was merely a heart condition. A. Well, I stated it was a heart condition, but as to what brought it on I didn't state. *I didn't know at that time.* Q. Do you know now? A. *I don't know now. I'm not so sure now, but it could possibly be* it was a strain, overwork, that sort of thing. I do know he was a very strong healthy man, so far as I know. I have never known him being sick."

\* \* \*

"Q. Isn't it very common for a man 59 years of age to develop a heart condition such as Mr. Daniels has? A. Oh, they will, yes, it is true. Q. And they will develop it independent of any strain? A. Well, I don't know about that. They do it, I know that, maybe worry, maybe

strain, it may be the manner of living, there may be a number of things will do those things for the average individual. Q. Would worry bring it on? A. Worry would. Q. There are a lot of possible things that could bring on a condition such as this? A. Well, they could, yes. Q. In your opinion, Doctor, would you say this was brought on by work over a period of years or months, or by one definite strain? A. *I don't know. I don't know. I suspect that this thing has really been coming on.* \* \* \* Q. Would you say that the heart enlarges suddenly or that it enlarges gradually? A. Well, they may enlarge suddenly, acute dilatation, suddenly. Q. You don't know whether Mr. Daniels' heart enlarged suddenly? A. No, I don't."

The instant case in many particulars is strikingly similar to that of *Coors Porcelain Co. v. Grenfell,* 109 Colo. 39, 121 P. (2d) 669, in which the district court ordered an award in favor of claimant. We reversed that order, using the following pertinent language: "In this case there is no definite opinion of any examining physician that death was due to any particular reason but that it could have resulted from either of two causes, leaving the commission to determine which cause was operating in this particular case."

It was definitely announced in *Industrial Commission v. White,* 97 Colo. 322, 49 P. (2d) 434 that courts may not enter the realm of the fact finding body. See, also, *New Jersey Co. v. Patterson,* 86 Colo. 580, 284 Pac. 334; *Clarke v. Clarke,* 95 Colo. 409, 36 P. (2d) 461; *A. Carbone & Co. v. MacGregor,* 113 Colo. 241, 155 P. (2d) 994.

In *Olson-Hall v. Industrial Commission,* 71 Colo. 228, 205 P. 527, we said:

"There is no direct proof of the accident. \* \* \* There is not a scrap of competent testimony to show that there ever was an accidental injury at all.

"It is elementary in compensation cases, as in other actions, that the burden of proof is upon the party asserting the claim. It was the duty of claimant to show that

the death of her husband was the proximate result of an accident arising out of and in the course of his employment."

\* \* \*

"There is some testimony which tends to show that there was a possibility of the pericarditis having resulted from an external injury. The only effect of this testimony, however, is to furnish a conflict, and the findings of the commission, on conflicting testimony, is conclusive upon the courts."

In the instant case there was no evidence before the commission of an accidental injury in the course of decedent's employment. As was said in *A. Carbone & Co. v. MacGregor, supra:* "In the trial judge's decision we recognize the generous heart promptings for which he is known and beloved, but, as we think, the unfavorable findings by the tribunal authorized by the enactment on which the claim is presented, to make them, concluded the trial court and likewise concludes us."

The judgment is reversed.